D+F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SPOTLESS ENTERPRISES, INC.,
and SPOTLESS PLASTICS PTY. LTD.,

                                        MEMORANDUM
                                        AND ORDER

            Plaintiffs,

      - against -                       Civil Action No.
                                        97-CV-0427 (DGT)
                                        01-CV-7815 (DGT)
A&E PRODUCTS GROUP L.P.,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TRAGER, District Judge:

      Spotless Plastics Pty. Ltd., an Australian entity ("Spotless

AU"), and Spotless Enterprises, Inc.[1] ("Spotless USA")

(collectively, "Spotless"), are manufacturers of clothing

hangers.  Spotless brought these actions against Carlisle

Plastics, Inc. ("Carlisle"), now known as A&E Products Group,

L.P.,[2] alleging infringement of various patents and trademarks.

A&E counterclaimed for declaratory judgment of non-infringement

or invalidity of the asserted patents and trademarks.  The

_____

      [1] Spotless USA is the exclusive licensee of all the
intellectual property at issue in this case.  Before it changed
its name, Spotless Enterprises, Inc., was known as Plasti-form
Enterprises, Inc.  Some of the hangers made by Spotless are often
still referred to as Plasti-form hangers.

      [2] Carlisle was the successor-in-interest to Different
Dimensions, Inc. ("DDI").  A&E Products Group, L.P., Carlisle and
DDI are hereinafter collectively referred to as A&E.

C/M .

surviving claims of the two above-captioned actions were consolidated for trial.

Spotless is alleging that A&E's accused hangers infringe U.S. Patent No. 5,884,422 (the "'422 patent"), U.S. Patent No. Des. 371,246 (the "'246 design patent"), U.S. Patent No. Des. 377,717 (the "'717 design patent"), U.S. Trademark Registration No. 2,439,767 (the "'767 registration") and U.S. Trademark Registration No. 2,378,405 (the "'405 registration"). A&E, however, claims that the utility and design patents are either invalid or are not infringed by A&E. A&E is also seeking the cancellation of Spotless asserted trademarks as invalid or a finding of non-infringement. Counsel for both parties ably presented their respective cases at a bench trial and have submitted post-trial briefs.

## Background

### (1)

This is yet another case before this court relating to the intellectual property rights of certain plastic hangers, lingerie – or intimate apparel – hangers to be specific. But this case teaches an economic and legal truth that is, nonetheless, universal: motivated ingenuity begets innovation, begets efficiency, begets value, begets imitation, begets

-2-

litigation – which, yes, begets motivated ingenuity and innovation.

To better understand the intellectual property at issue, it is useful to retrace some of the changes in the past decades in the retail apparel industry as it relates to hangers and the development of the commercial products manufactured by the parties.  Up through the 1980's, retailers generally received much of their apparel without the hangers or tags on them.  The store clerks would then place the garments on hangers and tag the garments with size, brand and pricing information before displaying the garment for sale.

During the 1980's, mass retail merchandisers like Wal-Mart, K-Mart and Target Stores began what was known in the industry as Garment on Hanger ("GOH") programs, which meant that the garments were placed on specified hangers at the factory by the garment manufacturer rather than at the store.  As part of the GOH program, retailers would also direct the manufacturers – often, at a foreign locale – to affix specified English-language tags upon the garment indicating pricing and other information.  The GOH programs reduced retailer labor costs by allowing store clerks to move garments directly from the shipping containers to the display racks without the additional labor of tagging and placing the garments on hangers.  Retailers were also able to direct manufacturers participating in the program to use specific

-3-

hangers intended to create a more efficient display and further reduce labor costs.

The GOH program also revolutionized the retail marketing and display of intimate apparel. Retailers went from selling intimate apparel in "in boxes stored under the counter" to marketing them in visible, well-designed displays as part of a GOH program. Spotless's Trial Br., at 3. Because the GOH program allowed the retailers to standardize and pre-determine the exact hanger format, it created many opportunities to create efficiencies for many retailers, particularly when magnified by the sheer number of store branches. These opportunities were indeed well exploited by Spotless and A&E through the sale of hangers that had caps indicating sizing and other information.

A&E, through its predecessor, DDI, has long been a market leader in the hanger and size cap industry, but has, until fairly recently, only manufactured hangers with a side sizer. As its name suggests, a side sizer has an indicator on the side of the hook above the garment. The side-sizer system is still the dominant sizer system for non-lingerie garment hangers.

In the early 1990's, Spotless began marketing its own sizer system in the United States, in particular for intimate apparel hangers. The sizer system developed by Spotless, unlike A&E's side-sizer system, have indicators attached to the top of the

-4-

hook.   The indicator caps used by Spotless are known as top
sizers.

These sizers – whether top sizers or side sizers – are
usually color-coded and display information about the garment
such as the size.   The use of top sizers - as well as side
sizers, but not to the same extent - allows a customer to scan a
display rack of garments and quickly find the size or variety
desired simply by looking at the top - or the side - of the
hanger hook.   The sizer system also allows store clerks to more
easily arrange clothing in a display by size ("to zone" garments)
and to easily recognize when display racks should be restocked.

The top-sizer hangers marketed in the United States by
Spotless were developed after Spotless had successfully
commercialized an early version of the top sizer in Australia.
The top-sizer system developed and marketed to mass merchandisers
in the United States, unlike previous versions of the top sizers,
could be automated – meaning that the caps and the hangers could
be coupled by a machine, a process that would reduce labor costs
to manufacturers in the United States.[3]   Spotless also felt that
the Australian version was too bulky-looking and that the

---

[3] The use of automation to either place the sizer on the
hanger or to assist in placing the garment on the hanger is
limited to manufacturers in this country where the reduced labor
expenses justify the costs of procuring automation equipment.
See Tr. at 267.

-5-

rectangular shape of the newer hangers was an aesthetic advance over the Australian version.

In 1990, after a near-deal with K-Mart to introduce the top-sizer system collapsed, Spotless had the "good fortune" to be introduced to Wal-Mart. Wal-Mart instituted a trial top sizer program that was well-received. This was the first time any retailer had instituted a top sizer program in this country.

At around the same time as Spotless was introducing the top-sizer system to Wal-Mart, Wal-Mart was in the process of upgrading the garment displays in its intimate apparel department in an effort to increase sales. Before the upgrade, the garments were hung on a traditional horizontal bar in a manner that only the edge - or the side - of the garment would be visible to the customer. The displays were changed so that the garments were hung "faced out" on a railing that pointed toward the customer. Tr. at 92. By having the garments face out toward the customer, the front of the first garment is visible. Each fixture can have as many as eight such railings across the length of the display rack.

Because most intimate apparel is not full length, each display can accommodate several rows of garments. However, the "vertical density" of these displays is generally limited to four rows. Tr. at 19, 94-96. Vertical density relates to how many rows of garments can be hung on a single display rack. Increased

vertical density is desired by retailers because they can display
additional items without the expense of expanding floor space.
Wal-Mart and others were hoping to increase vertical density by
reducing the vertical space used by the hanger itself.

In the early 1990's, A&E introduced a hanger, the A&E 2401
(the "2401"), which purported to maximize the vertical density.
See PTX 910; Figure A below.  However, the 2401 did poorly in
trial runs because, inter alia, the hook was too small, making it
difficult to slide the hanger on and off the railing.  The 2401
hanger was not approved by Wal-Mart and did not enjoy commercial
success.



Figure A; PTX 910.

However, where A&E failed, Spotless succeeded.  Working with
Wal-Mart, Spotless commercially developed the WP-25, which is a
commercial embodiment of the intellectual rights in dispute in
this case.  See Figure B below.  The WP-25 combined the top-sizer

-7-

system with a "low profile" hanger; by raising the clips[4] at the ends of the hanger, the vertical space used by the hanger was reduced and allowed Wal-Mart to add a fifth row of intimate apparel to their display racks - thus maximizing vertical density.



Figure B (the WP-25).

The WP-25 was approved by Wal-Mart, meaning that many manufacturers in the Wal-Mart GOH program were required to use the WP-25 hanger. However, the hanger agreement was mutually non-exclusive: Wal-Mart was free to approve other hangers, and Spotless was free to market its hangers to other merchandisers - which it did.

_____

[4] In addition to the low profile, the WP-25 also incorporated an additional vertical panty clip at the ends (allowing the hanger to be used for both panties and bras separately or together as a coordinated set). See Tr. at 103. Additionally, the hanger arms to the immediate right and left of the base of the hook (the horizontal inner arms) were designed to accommodate promotional cards that could be folded over the flat top of the inner arms. See Tr. at 94.

Subsequently, Spotless entered into arrangements with other merchandisers, though only Target and its sister store, Mervyns, entered into an exclusive arrangement with Spotless that required that the manufacturers purchase their hangers only from Spotless.[5] Needless to say, the top-sizing system was a commercial success. Spotless has since sold over 3 billion hangers for garments manufactured for the United States marketplace.

As the popularity of Spotless's top-sizer system increased, A&E's side-sizer system lost favor commensurately. In response, A&E began developing its own low profile and top-sizer hanger. Acutely aware of Spotless's asserted patents and trademarks, A&E set about to develop a hanger that it believed would encompass the features that propelled WP-25 to success without infringing on Spotless's intellectual property.

Initially, A&E marketed top sizers that were notably round at the edges, rather than the rectangular top sizer offered by Spotless. However, Wal-Mart refused to approve the use of A&E's top sizer. Wal-Mart did not want the customers shopping at Wal-Mart to be confronted with a hodge-podge of hangers on the same

---

[5] Manufacturers who ship garments that do not comply with the exact specification mandated by the merchandiser risk a "chargeback," meaning that the merchandiser will deduct a portion of the agreed-upon price. See Tr. at 845. As such, even if a non-approved hanger was cheaper, it would make little economic sense for a manufacturer deliberately to use a hanger that was not approved by the merchandiser and risk a chargeback.

display; it insisted that the A&E hangers have the same "overall appearance" of the WP-25 before it would approve the A&E hangers. Tr. at 741.

A&E finally succeeded in obtaining Wal-Mart's approval in 2000 when it utilized a more rectangular top sizer and proceeded to manufacture the 6000 hanger with the corresponding 6005 top sizer.[6]   See Figure C below.[7]   The A&E top sizer is interchangeable with the Spotless WP-25, meaning that the top sizer of the A&E hanger fits onto the WP-25 and the top sizer of the WP-25 fits onto the A&E hanger.   A&E commercialized the hanger and, after overcoming some production difficulties, began selling the A&E hanger in 2001.   The A&E hanger is the device accused of infringing the patent and trademarks asserted in this action.

---

[6] A&E sells the A&E 6000 hanger and the 6005 top sizer as separate units.   However, unless indicated otherwise, references to the "A&E hanger" are to the combined unit.

[7] Figure C shows the top-sizer model that was actually commercialized by A&E.   The top sizer that Wal-Mart initially approved was never commercialized because of production difficulties.   That top sizer was almost identical to the top sizer in Figure C, except that instead of the vertical grooves shown in the figure, the earlier version contained a crosshatch design.



Figure C (the A&E 6000 hanger with 6005 top sizer).

## Discussion

Spotless claims that A&E has infringed on its various intellectual property rights, including utility patents, design patents and trademarks. Each form of intellectual property will be analyzed in turn, though, as will become evident, these forms of intellectual property are not always mutually inclusive - indeed, they sometimes cannot inhabit the same realm. At the trial, this had the curious effect that, without the benefit of context, it would have been difficult at times to gauge whether testimony was introduced on behalf of Spotless on the utility patent or against Spotless on the trademark or design patents and vice versa.

-11-

**The '422 Patent**

(1)

The '422 patent entitled "Indicator and Garment Hanger,"
issued on March 23, 1999, designating Spotless AU as assignee.
See PTX 763; Exh. 510.  The named inventors were Spotless AU
employees.  The '422 patent issued from a series of divisional,
continuation and continuation-in-part applications.  A terminal
disclaimer provides that the '422 patent will expire no later
than U.S. Patent No. 5,388,354 (the "'354 patent"), which is
currently set to expire on February 14, 2012.

The '422 patent relates to "indicators for garment hangers
of the type which may be used to indicate the size of a garment."
Exh. 510 at col. 1, lines 24-25.  In the preferred embodiment
shown below, see Figure D, the hollow rectangular indicator cap
is "dimensioned to receive a top web W of the hook H of a garment
hangers [sic], as shown in FIGS. 3 and 4 of the drawings.  The
sides 2 and 3 are formed with generally rectangular slots 5 and 6
. . . which are dimensioned and positioned to receive abutments A
formed on either side of the web W . . . to lock in the indicator
. . .."  Id. at col. 3-4, lines 67, 1-6.  In the preferred
embodiment, as indicated in FIG. 3 of the drawings below, the
slots 5 and 6 that correspond to the bosses extend from inside
the cap through the outside surface.

-12-

Case 1:97-cv-00427-DGT-RML   Document 249   Filed 12/03/03   Page 13 of 66 PageID #: 13



Figure D (<u>see</u> PTX 763; Exh. 510).

FIG.1

FIG.3

FIG.2

FIG.4

Spotless is asserting that A&E is infringing claims 1-4, 6, 7 and 9-13 (claims 1, 7, 10 and 11 are independent claims) of the '422 patent.  Recited below are the relevant portions of the independent claims of the '422 patents:

>  1.  In combination, a hanger for garments and other articles and an indicator securable to said hanger for indicating information associated with the garment or article;
>  said hanger defining a hook for engaging a structure, said hook including a support for receiving said indicator and also including means for engaging said indicator; and
>  said indicator being receivable on said support, said indicator including a substantially hollow body having at least four sides and defining an open bottom, <u>a generally parallel pair of opposed sides and a generally parallel</u> pair of opposed ends connecting said sides, <u>each of said sides having a generally planar outer side surface</u> for displaying the information and inner side surfaces, at least one of said inner side surfaces including <u>means for interlocking</u> with said engaging means of said hanger hook to secure said indicator to said hook when said indicator is received on said support and each of said sides being configured and dimensioned to resiliently bow outwardly such that said indicator is engageable with <u>or disengageable from</u> said support by causing at least one of said sides to bow outwardly relative to said support.

>  7.   A combination hanger for garments and other articles, and an indicator securable to said hanger for indicating information associated with the articles; . . .
>  said indicator including a substantially hollow body having at least four sides and defining an open bottom, <u>a generally parallel pair of opposed sides, and a generally parallel pair of opposed ends</u> connecting said sides, <u>each of said sides having a generally planar outer side surface and inner side</u>

surfaces, at least one of said inner side surfaces _defining at least one elongated opening including means for interlocking_ with said engaging means of said hanger hook to secure said indicator to said hook when said indicator is received on said support, _said means for interlocking comprising a retaining shelf associated with said opening_, each of said sides being configured and dimensioned to resiliently bow outwardly such that said indicator is engageable with or _disengageable from_ said support by causing at least one of said sides to bow outwardly relative to said support.

10.   A combination hanger for garments and other articles, and an indicator securable to said hanger for indicating information associated with the articles; . . .
     [the indicator's] inner side surfaces respectively _defining at least one opening including means for interlocking_ with said engaging means of said hanger hook to secure said indicator to said hook when said indicator is received on said support, where said openings defined in said inner side surfaces are disposed opposite to each other . . ..

11.   A combination hanger for garments and other articles, and an indicator securable to said hanger for indicating information associated with the articles; . . .
     at least one of [the indicator's] inner side surfaces _defining means for engaging_ said hanger; and
     said hanger defining a hook for engaging a structure, said hook including a support for receiving said indicator and also including means for retaining said indicator said retaining means interlocking with said engaging means of said indicator to secure said indicator . . ..

Exh. 510 at col. 6-8 (emphasis added).

(2)

Determining infringement involves a two-step process of both law and fact.  See Omega Engineering, Inc., v. Raytek Corp., 334 F.3d 1314, 1320 (Fed. Cir. 2003).  "'First, the claim must be properly construed to determine its scope and meaning.  Second, the claim as properly construed must be compared to the accused device or process.'"  Id. (quoting Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993)).  "Step one, claim construction, is a question of law[.]" Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1370 (Fed. Cir. 2003) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995)).  Step two, "comparing the properly construed claims to the accused device, is a question of fact."  Omega Engineering, 334 F.3d at 1320 (citing Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998)).

"'The starting point for any claim construction must be the claims themselves.'"  Interactive Gift Exp., Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305, 51 USPQ2d 1161, 1165 (Fed. Cir.1999)).  "If the claim language is clear on its face, then . . . consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified."  Id.  "A deviation may be necessary if 'a patentee [has chosen] to be his own

-16-

lexicographer and use terms in a manner other than their ordinary meaning' . . . [or] if a patentee has 'relinquished [a] potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference.'" Id. (alteration in original) (internal quotation and alterations omitted).

"The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence." Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324-25 (Fed. Cir. 2002) (citing Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 1996)); see also Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 807 (Fed. Cir. 2002) (holding that in construing the claim scope or any unclear claim language, "courts may consult the specification, the prosecution history, and other relevant evidence") (internal quotation omitted). "The specification may assist in resolving ambiguity where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." Teleflex, 299 F.3d at 1325 (citation omitted). However, courts are admonished that "the claims must be read in view of the specification . . . [and] limitations from the specification are not to be read into

-17-

the claims." Id. at 1326 (internal and external citations omitted).

Similarly, the prosecution history can also be of "primary significance in understanding the claims" and should be consulted to "ascertain the true meaning of language used in the patent claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384 (1996); see also Teleflex, 299 F.3d at 1326. However, as with reliance on the specifications, courts are once again admonished that "[the prosecution history] too cannot 'enlarge, diminish, or vary' the limitations in the claims." Markman, 52 F.3d at 980 (citation omitted).

"'This [intrinsic] evidence is usually sufficient to interpret a term, and, if it is sufficient, it is improper for a court to resort to extrinsic evidence.'" Spotless Enterprises, Inc. v. Carlisle Plastics, Inc., 144 F. Supp. 2d 167, 171 (E.D.N.Y. 2001) (citing Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 705-06 (Fed. Cir.1997)). "If however a claim limitation is still not clear, [courts] may look to extrinsic evidence to help resolve the lack of clarity." Interactive Gift Exp., 256 F.3d at 1332 & n.1 (noting that "[d]ictionaries, which are a form of extrinsic evidence, hold a special place and may sometimes be considered along with the intrinsic evidence").

-18-

After construing the claim limitations, the finder of fact
must apply the claims to the accused device.  See Allen Eng'g
Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1345 (Fed. Cir.
2002).  "Literal infringement requires a patentee to prove by a
preponderance of the evidence that every limitation of the
asserted claim is literally met by the allegedly infringing
device."  Biovail Corp. Int'l v. Andrx Pharm., Inc., 239 F.3d
1297, 1302 (Fed. Cir. 2001) (citation omitted).  "Even if one or
more of the claim limitations are not literally present in the
accused device, thus precluding a finding of literal
infringement, the claim may still be held infringed if
equivalents of those limitations are present."  Allen Eng'g, 299
F.3d at 1345 (citing Warner-Jenkinson Co. v. Hilton Davis Chem.
Co., 520 U.S. 17, 24, 117 S. Ct. 1040 (1997)).  "Equivalents are
assessed on a limitation-by-limitation basis . . . [and] may be
established by a showing by preponderant evidence that an element
of an accused device 'does substantially the same thing in
substantially the same way to get substantially the same result'
as the claim limitation."  Id. (internal and external quotations
and citations omitted).  Under the concept of insubstantial
difference, "[a] claim element is equivalently present in an
accused device if only insubstantial differences distinguish the
missing claim element from the corresponding aspects of the
accused device."  Id. (internal quotations omitted).

-19-

A&E points to several limitations in the claims of the '422 patent that, according to A&E, are not infringed by its hanger. A&E argues that its top sizer indicators do not have (1) a "means for interlocking" with the hanger or an "opening;" (2) with "generally parallel" ends or "generally parallel" sides; (3) with at least four sides with planar outer-side surfaces; or (4) that is disengageable from the hanger.  See A&E Post-Trial Brief, at 2.

## A.    "Means for Interlocking"

A&E argues that the "means for interlocking" limitation should be construed as requiring a slot that, unlike the aperture in A&E's top sizer, extends fully through the side wall of the top sizer.  Spotless, on the other hand, is seeking a broader construction that would literally encompass A&E's hanger.

Claims 1, 7, 10 and 11 [8] of the '422 patent contain the term "means for interlocking" in their limitations.  "A claim

_____

[8] In claim 11, the construction of the term "means for engaging" is at issue rather than the term "means for interlocking."  Other than in claim 11, the "means for engaging" limitation refers to the mechanism on the hook portion of the device (the boss) that engages the "means for interlocking" on the indicator.  In claim 11, however, the "means for engaging" limitation refers instead to the indicator portion of the device. Neither party has claimed that the "means for engaging" limitation as used in claim 11 differs substantively from the "means for interlocking" limitation used in the claim 1.  As such, the means-plus-function analysis used in claim 1 to define "means for interlocking" applies to "means for engaging" in claim 11, and their construction is identical.

limitation may be expressed in means-plus-function format in accordance with 35 U.S.C. § 112, paragraph 6, which reads as follows:

> 'An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'

Allen Eng'g, 299 F.3d at 1347 (quoting 35 U.S.C. § 112, ¶ 6 (2000)).  In essence, 35 U.S.C. § 112, ¶ 6 allows a patentee to "define the structure for performing a particular function generically through the use of a means expression, provided that it discloses specific structure(s) corresponding to that means in the patent specification."  Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1360 (Fed. Cir. 2000).

"Use of the term 'means' in a claim limitation creates a presumption that 35 U.S.C. section 112, paragraph 6 has been invoked, but that presumption may be rebutted if the properly construed claim limitation itself recites sufficiently definite structure to perform the claimed function."  Id. at 1361; see Allen Eng'g, 299 F.3d at 1347.  The determination of "[w]hether the language of a claim is to be interpreted according to 35 U.S.C. § 112, ¶ 6, i.e., whether a claim limitation is in means-plus-function format, is a matter of claim construction and is thus a question of law[.]"  Kemco, 208 F.3d at 1360.

-21-

Here, claims 1, 7, 10 and 11 use the term "means."
Accordingly, they are presumed to employ means-plus-function
limitations.  However, the parties agree that claim 7 [9] recites
sufficient structure to perform the function and, therefore, do
not invoke 35 U.S.C. § 112, ¶ 6.[10]

In claim construction involving a mean-plus-function
limitation, "a court must identify both the claimed function and
the corresponding structure in the written description for
performing that function."  <u>Wenger Manufacturing, Inc., v.</u>
<u>Coating Machinery Sys., Inc.</u>, 239 F.3d 1225, 1233 (Fed. Cir.
2001).  Here, the parties do not dispute that the function is the
snap-fit engaging of the boss with the corresponding structure.
However, the parties hotly contest the nature of the
corresponding structure.

_____

[9] The relevant portion of claim 7 reads as follows: "at
least one of said inner side surfaces <u>defining at least one</u>
<u>elongated opening</u> including means for interlocking with said
engaging means of said hanger hook to secure said indicator to
said hook when said indicator is received on said support, <u>said</u>
<u>means for interlocking comprising a retaining shelf associated</u>
<u>with said opening</u>."  Exh. 510 at col. 7, lines 56-62.  (emphasis
added).

[10] The parties are disputing whether or not the language in
claim 10, which includes the term "opening," cites sufficient
structure to perform the function to be construed under §112, ¶
6.  However, that question is not dispositive and need not be
decided because if claim 10 is construed under §112, ¶ 6, then
the structure is identical to that in claim 1, and if it is not
construed under §112, ¶ 6, the term "opening" would be no broader
that the same term in claim 7.

Spotless argues that the structure is the lower horizontal surface of the opening aligned to interlock with the horizontal surface of the abutment.  In support for its construction, Spotless points to the specification in the '422 patent:

> The sides 2 and 3 are formed with generally rectangular slots 5 and 6 recessed therein centrally located adjacent the lower edges of the sides 2 and 3, and which are dimensioned and positioned to receive abutments A formed on either side of the web W of the hook H of the hanger to lock the indicator in position on the hook H.  The <u>lowermost horizontal surfaces</u> of slot 5 and 6 each <u>form a retaining shelf which engages the abutment</u>.  The entry of abutments A into slots 5 and 6 is achieved by the resilience of the plastic molding forming the body 1.

Exh. 510 at col. 4, lines 2-11.

A&E argues, however, that the structure is the slot shown (5 and 6 in Figure 3 above) that extends through the outside surface of the indicator.  A&E also points to the prosecution history and argues that Spotless's construction would be inconsistent with its position taken before the examiner that the aperture must extend through the wall of the top sizer.

In the course of prosecuting the '354 patent, a grandfather patent to the '422 patent, the examiner had rejected the '354 patent as being unpatentable over the prior art, specifically, Australian Patent No. 57,011/80 (the "Australian Patent").  <u>See</u> Exhibit 554, tab 22, p. 189; Exhibit 554, tab 26, p. 218.  The Australian Patent also taught a top sizer, though the Australian

-23-

top sizer was trapezoidal-shaped and was larger than what was taught by the '354 patent.  The Australian Patent was also more easily releaseable because the protuberance was in the form of a bead or a rib that, given its smaller size and curvature, did not provide the resistance to securely latch onto the corresponding ridge.



Figure E (<u>see</u> Exh. 511, at FIGS. 3-4).

In seeking to differentiate between its application and the prior art, Spotless argued to the U.S. Patent and Trademark Office (the "PTO"), <u>inter alia</u>, that

> <u>Applicants' aperture</u> is designed to extend <u>completely through</u> its respective sidewall and to interlock with a corresponding means on the web of the hanger hook.

Exhibit 554 at 209 (emphasis in original by Spotless).[11]  The examiner then issued the '354 patent.

A&E argues that this statement bars any construction of the means for interlocking limitation that does not encompass an

---

[11] The fully extended hole has an additional benefit in that it facilitates stacking the top sizers by threading a string through the holes of the top sizers.  <u>See</u> Exh. 510, col. 3, lines 20-22.

-24-

aperture that "extend[s] completely through" the wall of the top
sizer.  Indeed, it is well-settled that the "'prosecution history
(or file wrapper) limits the interpretation of claims so as to
exclude any interpretation that may have been disclaimed or
disavowed during prosecution.'"  Omega Engineering, 334 F.3d at
1323-24 (quoting Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d
448, 452 (Fed. Cir. 1985)) ("The doctrine of prosecution
disclaimer is well-established in Supreme Court precedent,
precluding patentees from recapturing through claim
interpretation specific meanings disclaimed during prosecution.")
(citations omitted); see Ekchian v. Home Depot, Inc., 104 F.3d
1299, 1304 (Fed. Cir. 1997) ("[B]y distinguishing the claimed
invention over the prior art, an applicant is indicating what the
claims do not cover, he is by implication surrendering such
protection.").

The relevant inquiry is whether a competitor would
reasonably believe that the applicant had surrendered the
relevant subject matter, based on a clear and unmistakable
surrender. Id.; Eagle Comtronics, Inc. v. Arrow Communication
Laboratories, Inc., 305 F.3d 1303, 1316 (Fed. Cir. 2002)
(explaining the different standards between argument-based
estoppel - such as here - and amendment-based estoppel).[12]

_____

[12] In effect - though not necessarily intended as such - the
doctrines of prosecution disclaimer and prosecution history
estoppel dissuade applicants from employing a scattershot

Accordingly, where a "patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Eagle Comtronics, 305 F.3d at 1324.

The doctrine also applies to claims involving means-plus-function language. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1457 (Fed. Cir. 1998) (en banc); Omega Engineering, 334 F.3d at 1324-25 (citing Ballard Med. Prods. v. Allegiance Healthcare Corp., 268 F.3d 1352, 1359-62 (Fed. Cir. 2001) (invoking the prosecution history in finding that the accused device was not equivalent to the structure in the means-plus-function limitation)). Moreover, the "relevant prosecution history . . . includes not only the . . . application [at issue] but also the parent . . . and grandparent . . . applications." Mark I Mktg. Corp. v. R.R. Donnelly & Sons Co., 66 F.3d 285, 291

---

approach to distinguishing their application over the prior art. In this case, e.g., Spotless is perhaps correct that even had it used a narrower distinction over the prior art - namely, that the flat horizontal surface is distinct from the semi-circular rib in the Australian Patent - the '354 patent may still have been patentable. However, while an applicant is not prevented from arguing to the examiner that a more narrow distinction over the prior art is sufficient, it does so at the higher risk, of course, of rejection. By unambiguously distinguishing its claims more broadly over the prior, the applicant indeed increases the likelihood of a favorable determination, but when it creates a potential detriment to competitors on notice, the applicant must then live with the broader distinctions. See Eagle Comtronics, 305 F.3d at 1316.

(Fed. Cir. 1995) (citing <u>Jonsson v. Stanley Works</u>, 903 F.2d 812, 818 (Fed. Cir. 1990)); <u>Biovail</u>, 239 F.3d at 1301 ("when multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation").[13]

A&E argues that Spotless's proposed construction conflicts with the unambiguous position taken by Spotless before the PTO. Spotless and A&E – being under the mistaken impression that if the structure is construed to be the interlocking of the horizontal surfaces, then the structure includes a slot even if it does not extend through the wall – have devoted much of their energy arguing on behalf of their proposed constructions. However, Spotless correctly points out that its construction simply defines the structure for the "mechanical reality" of the boss engaging the slots. As such, even if the structure is construed as a horizontal surface, that still does not settle the question whether the horizontal surface of the slot must extend

---

[13] Spotless's argument that the prosecution history is not relevant here because the claim in the '422 refers to an "opening" rather than an "aperture" is not persuasive. Given the similar nature of the terms, "'it is incorrect to construe a claim as encompassing the scope that was relinquished in order to obtain allowance of another claim, <u>despite a difference in the words used</u>,'" <u>Roche Diagnostics Corp. v. Inverness Med. Tech., Inc.</u>, 186 F. Supp. 2d 914, 941 (S.D. Ind. 2002) (emphasis added) (quoting <u>Modine Mfg. Co. v. United States Int'l Trade Comm'n</u>, 75 F.3d 1545, 1551 (Fed. Cir. 1996)).

through the wall of the top sizer.  Even under Spotless's
formulation, the prosecution history is not inherently
inconsistent with its construction so long as the lower
horizontal surface of the slot extends through the wall of the
top sizer.

Accordingly, given the unambiguous and emphatic argument by
Spotless to distinguish the prior art as lacking a fully extended
aperture, the structure for the means for interlocking is
construed as the lower horizontal surface of the slot extending
through the wall of the top sizer.

The question now becomes whether A&E's hanger infringes the
means for interlocking limitation.  A&E argues that its hanger
does not infringe the means for interlocking limitation because
its hanger does not contain an aperture that extends completely
through the wall of the top sizer.  Rather, A&E's hanger has a
recess with a retaining shelf that does not extend completely
through the wall of the top sizer.

"Literal infringement of a § 112, ¶ 6 limitation requires
that the relevant structure in the accused device perform the
identical function recited in the claim and be identical or
equivalent to the corresponding structure in the specification."
Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268-69
(Fed. Cir. 1999) (emphasis added).  That is, that the accused
device must "(1) perform the identical function and (2) be

-28-

otherwise insubstantially different [*i.e.*, statutorily equivalent] with respect to structure." Kemco, 208 F.3d at 1364. If the accused device does not literally infringe the § 112, ¶ 6 limitation "because it does not perform the identical function[,] . . . it may nevertheless still be an 'equivalent' under the doctrine of equivalents." Id.[14]

There is no dispute here that the accused device performs a function identical to the means for interlocking. However, A&E argues that there is no infringement because prosecution history estoppel precludes Spotless from claiming infringement of an aperture that does not extend completely through the side wall.

A&E's argument in favor of prosecution history estoppel is essentially the same that it successfully made in arguing prosecution disclaimer in the claim construction analysis. Indeed, the Federal Circuit has noted that the standard set forth for prosecution disclaimer "is the same standard applicable, in the context of the doctrine of equivalents, to the doctrine of

_____

[14] The Federal Circuit has made clear that despite the similarities, "a court must conduct a separate infringement analysis under the doctrine of equivalents after conducting an analysis of literal infringement for claim limitations written in means-plus-function format." ACTV, Inc., v. Walt Disney Co., 346 F.3d 1082, 1094 (Fed. Cir. 2003)(citing Apex Inc. v. Raritan Computer, Inc. 325 F.3d 1364, 1378 (Fed. Cir. 2003). Here, however, the parties do not dispute that the function of the accused device is identical; therefore, the same analysis that applies to the literal infringement inquiry is dispositive of the doctrine of equivalency analysis. See Kemco 208 F.3d at 1363-64 (explaining the difference between literal and equivalent infringement under § 112, ¶ 6).

argument-based estoppel . . . and that our precedent has
recognized a relation between the doctrines of argument-based
estoppel and prosecution disclaimer." Omega Eng'g, 334 F.3d at
1326 n.1 (citations omitted); see Augustine Med., Inc., v. Gaymar
Indust., Inc., 181 F.3d 1291, 1299 (Fed. Cir. 1999) ("If
sufficient to evince a clear and unmistakable surrender of
subject matter, arguments made during prosecution may also estop
an applicant from recapturing that surrendered matter under the
doctrine of equivalents." (internal citation and quotation
omitted)).[15]

For the reason set forth above in the prosecution disclaimer
analysis, Spotless is estopped from asserting infringement based
on an aperture that does not extend fully through the wall of the
top sizer.  Accordingly, the A&E hanger does not infringe the
means for interlocking limitation.

Finally, a similar claim construction and infringement
analysis holds true in construing the claims not employing means-

---

[15] It is worth noting that in the unique context of
infringement claims involving § 112, ¶ 6 limitations, the
relationship between prosecution disclaimer and prosecution
history estoppel is even closer because of the similarities
between literal infringement (i.e., statutory equivalence) and
infringement under the doctrine of equivalence.  Cf. Spectrum
Intern., Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 n.2 (Fed.
Cir. 1998) (noting the "clear distinction between following the
statements in the prosecution history in defining a claim term,
and the doctrine of prosecution history estoppel" (citation and
quotation marks omitted)).

-30-

plus-function language -- namely the "elongated opening" in claim 7 or "opening" in claim 10. The term "opening" is construed consistently with the arguments made before the examiner that the aperture extend completely through the wall of the top sizer, and the prosecution history estoppel operates to prevent a claim of equivalency. Accordingly, the A&E hanger does not contain the "means for interlocking" limitation.

**B.    "Generally Parallel"**

The claims also require that the top sizer have "<u>a generally parallel pair of opposed sides and a generally parallel</u> pair of opposed ends" Exh. 510, col. 7, lines 7-9. A&E argues that the term parallel is an absolute term that describes two lines or surfaces which are always equidistant and never meet, and that the modifier "generally," therefore, cannot be reconciled with the term parallel. Additionally, A&E argues that its sides and ends are not "parallel" because they are tapered, meaning that each side is angled at one half of one degree. Finally, A&E argues that because the ends of its hanger are semi-circular, its ends are not parallel.



Figure F (top view of A&E top sizer).

-31-

The task of determining the construction of the term
"generally parallel" has been eased by a recent Federal Circuit
decision involving that exact term.  See Anchor Wall Sys., Inc.,
v. Rockwood Retaining Walls, Inc., 340 F.3d 1298 (Fed. Cir.
2003).  In Anchor Wall Systems, the district court had held
"'that modifiers, no matter how strong, cannot alter the meaning
of a claim term describing a mathematical concept so that the
concept would be false if read to describe the accused device.'"
Id. at 1310 (quoting Anchor Wall Sys., Inc., v. Rockwood
Retaining Walls, Inc., 252 F. Supp. 2d 838, 852 (D. Minn. 2002)).
Accordingly, the district court effectively ignored the adverb
"generally" and held that "'[parallelism] is a mathematical
concept that is either true or false.'"  Id. (quoting Anchor Wall
Sys., 252 F. Supp. 2d at 853).  The Federal Circuit, however,
reversed that holding, finding that although, in the purest
sense, "generally parallel" is a mathematical misnomer, the use
of "words of approximation, such as 'generally' and
'substantially' are descriptive terms 'commonly used in patent
claims to avoid strict numerical boundaries to the specified
parameter.'"  Id. at 1310-11 (quoting Ecolab, Inc. v. Envirochem,
Inc., 264 F.3d 1358, 1367 (Fed. Cir. 2001) (internal quotations
omitted)).  Accordingly, the court found that "the phrase
'generally parallel' envisions some amount of deviation from
exactly parallel."  Id. at 1311.

The holding in <u>Anchor Wall Systems</u> is particularly
applicable in this case where the term "generally parallel" has a
meaning to those skilled in the relevant art of injection molding
(the method of manufacturing for the plastic hangers). As was
made abundantly clear at trial, drafting or tapering (molding the
plastics with a slight angle) is a commonly utilized technique to
make it easier to remove the plastic from the mold within which
it is made, and it is readily understood as such by those skilled
in the relevant art. Indeed, except when absolute parallelism is
required, a slight draft is common and properly expressed as
"generally parallel."

A&E argues, nonetheless, that the term "generally parallel"
does not provide sufficient guidance as to the scope of the
claims, thus rendering the claims indefinite. However, the term
"generally parallel" does not exist in a vacuum. As explained by
the former Production Manager of Spotless, the term "generally
parallel" would arise in the field of injection molding:

> if you wanted to specify something that was
> precisely parallel, you would go to some pain,
> some length to say this has to be exactly
> parallel.     Otherwise   the   term   generally
> parallel or substantially parallel would allow
> for there to be draft angles so that the
> features were not exactly parallel.

Tr. at 595-596.

The term "generally parallel" is, therefore, construed to
encompass a deviation from exactly parallel that is commonly

-33-

provided in order to assist in removing the plastic from the mold. Here, the draft angle of one half of one degree[16] in the A&E top sizer existed to facilitate its removal from the mold. See Tr. at 773-73. Accordingly, A&E's hanger, the sides of which contain a draft angle of one half of one degree literally infringes the "generally parallel" limitation.[17]

## C.   "Generally Planar"

As mentioned, the ends of the A&E hanger are semi-circular. In an effort to further distance its hangers from the '422 patent, A&E argues that the claims should be constructed so that they would require the ends of the top sizer to be planar.   A&E points to the following language in claim 7, which is representative of the other claims:

> said indicator including a substantially hollow body having <u>at least four sides</u> and defining an open bottom, a generally parallel pair of opposed sides and a generally parallel

---

[16] For context, if the height of the top sizer is one inch, an angle of one half of one degree would cause each side of the top sizer to be out of parallel by approximately 8 thousandths of an inch. See Tr. at 369. Accordingly to the expert testimony, the width of a human hair is approximately 4 thousandths of an inch. See id. at 973.

[17] A&E argues that the ends of its top sizer are not generally parallel because the ends of its top sizer are semi-circular. This argument confuses the parallel limitation with the planar limitation discussed below. As Spotless correctly points out, in ordinary usage, two non-flat surfaces can be parallel so long as they are equidistant - or in this case approximately equidistant. See Tr. at 369.

> pair of opposed ends connecting said sides,
> <u>each of said sides having a generally planar</u>
> <u>outer side surface</u> . . . .

Exh. 510, col. 7, lines 7-11 (emphasis added).  A&E argues that
the phrase "<u>each of said sides</u> having a generally planar surface"
refers back to "having at least four sides" - meaning that the
four sides must be planar.  However, a careful reading clearly
indicates otherwise.  After referring to the four sides, the
claims then go on to refer to the two sides (the sides where the
sizing information is located) as opposed to the "ends
connecting" them.

Moreover, immediately after the above-quoted limitations,
the claims require "at least one of said inner side surfaces
includ[e] means for interlocking."  <u>Id.</u>  The preferred embodiment
of the top sizers shown in the '422 patent contain a means for
interlocking only on the sides not on the ends.  A&E's proposed
construction, therefore, would exclude the preferred embodiment -
a construction not ordinarily correct.  <u>See</u> <u>Anchor Wall Systems</u>,
340 F.3d at 1308 ("[I]t is axiomatic that a claim construction
that excludes a preferred embodiment . . . is rarely, if ever
correct and would require highly persuasive evidentiary
support.") (citation and internal quotation marks omitted).
Accordingly, the "generally planar" limitation only requires
generally planar sides, not generally planar ends.

D.    "Engageable and Disengageable"

Each of the independent claims asserted by Spotless also
contains a limitation that the "indicator [be] engageable with or
disengageable from said support." Exh. 510 at col. 7-8.  A&E
argues that Spotless did not prove at trial that the A&E hanger
is disengageable and that Spotless even concedes that A&E's
hangers are not "readily releaseable."

A&E's argument is without merit.  It is clear from the
evidence presented at trial that, as the term was used, readily
releaseable and disengageable refers to the relative ease in
which the top sizer will pop off from the hanger.  The A&E
hanger, while not as readily releaseable as, say, the Australian
hanger, is still disengageable.  See Tr. 193, 1098.  Indeed, even
the WP-25 hangers are disengageable (despite having the aperture
extending through the wall).  See id. at 325.

However, given that A&E hanger does not contain the "means
for interlocking" limitation, the A&E hanger does not infringe
the '422 patent.

### (2)

### Invalidity

A&E also argues that if the claims are construed so that the
aperture does not have to fully extend through the sizer wall,
then the '422 patent is invalid over the prior art, specifically,

-36-

the Australian Patent.  However, because the claims have been
construed to require an aperture extending completely through the
wall, the validity of the '422 patent is conceded by A&E.

A&E, however, also argues that the '422 patent
specifications fail to enable the invention to be practiced
because it lacks the detail as to what material should be used.
That argument fails.  The specifications refer to use of
"suitable plastic material," which, as made clear at trial, is
understood by an artist skilled in the art to refer to any
"commodity grade cheap polymer."  See Tr. 599-600.

-37-

## The Design Patents

### (1)

The '246 design patent was issued on July 2, 1996, and claims the "ornamental design for a garment hanger," which covers the low profile, top sizer, hook and clip features, as shown in Figure G below.



Figure G.

The '717 design patent was issued on February 4, 1997, and claims the "ornamental design for a garment hanger," which covers

only the hook and low profile features, as shown in Figure H
below.[18]  See Exh. 537.



Figure H.

Spotless claims that the A&E hanger (Figure C above)
infringes both the '246 and '717 design patents.  A&E counters
that the patents protect only the ornamental features of the
patents, and that the features alleged to have been infringed are
functional, and, thus, not protected by the design patents.  In
the alternative, A&E claims that the design patents are primarily
functional and are invalid.

"As with utility patents, determining whether a design
patent is infringed is a two-step process."  Catalina Lighting,
Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1286 (Fed. Cir. 2002).
"First, the court must construe the design patent's claim."  Id.
(citing Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed.
Cir. 1995)).  Next, the fact-finder must compare the claim and

---

[18] The clips and top sizer features are not part of the
claimed design in the '717 design patent.

the accused device, employing the 'ordinary observer' test and the 'point of novelty' test." Id. (citing Contessa Food Prods., Inc., v. Conagra, Inc., 282 F.3d 1370, 1377 (Fed. Cir. 2002)). The comparison prong is an issue "of fact to be proven by a preponderance of the evidence." Braun Inc., v. Dynamics Corp. of Am., 975 F.2d 815, 819 (Fed. Cir. 1992).

"In construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" Contessa Food Prods., 282 F.3d at 1376 (quoting Durling v. Spectrum Furniture Co., 101 F.3d 100, 104-05 (Fed. Cir. 1996)). However, "[a] design patent only protects the novel, ornamental features of the patented design." OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1405 (Fed. Cir. 1997) (citation omitted). Accordingly, "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." Id. (citation omitted); see Unidynamics, 157 F.3d at 1324 ("It is the non-functional, design aspects that are pertinent to determinations of infringement.") (internal quotation and alterations omitted).

As mentioned, the comparison prong of the analysis is a factual determination involving "two distinct tests, both of which must be satisfied in order to find infringement: (a) the

-40-

'ordinary observer' test, and (b) the 'point of novelty' test."
Contessa Food Prods., 282 F.3d at 1377 (quoting Unidynamics Corp.
v. Automatic Prods. Int'l, Ltd., 157 F.3d 1311, 1323 (Fed. Cir.
1998)).

> According to the "ordinary observer" test,
> "if, in the eye of an ordinary observer,
> giving such attention as a purchaser usually
> gives, two designs are substantially the same,
> if the resemblance is such as to deceive such
> an observer, inducing him to purchase one
> supposing it to be the other, the first one
> patented is infringed by the other."

Catalina Lighting, 295 F.3d at 1286 (quoting Gorham Mfg. Co. v.
White, 81 U.S. (Wall.) 511, 528 (1871)). "If . . . a design
contains both functional and ornamental features, the patentee
must show that the perceived similarity is based on the
ornamental features of the design." OddzOn Prods., 122 F.3d at
1405. "The patentee 'must establish that an ordinary person
would be deceived by reason of the common features in the claimed
and accused designs which are ornamental.'" Id. (quoting Read
Corp. v. Portec, Inc., 970 F.2d 816, 825 (Fed. Cir. 1992)).

In addition to the "ordinary observer" test, the "point of
novelty" test requires the patentee to prove that the "accused
design appropriates the novelty which distinguishes the patented
design from the prior art." Contessa Food Prods., 282 F.3d at
1377 ("The 'point of novelty' test is distinct from the 'ordinary
observer' test . . . [and] it is legal error to merge the two

-41-

test, for example, by relying on the claimed overall design as the point of novelty.").

Spotless argues that in distinguishing between the functional and ornamental features in the infringement analysis, the test should be the same as that used in determining the affirmative defense of invalidity based on functionality.  The test for functionality to invalidate a design patent is a "stringent" one[19] that requires a showing that "the appearance of the claimed design is dictated by the use or purpose of the article."  Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1378 (Fed. Cir. 2002) (internal quotations omitted).  Spotless argues that only the solely functional features – those that cannot be achieved with an alternative design – are excluded from the infringement comparison.  However, the process of distinguishing the ornamental features is merely a form of claim construction and is distinct from the functionality analysis of invalidity.  A design patent can be primarily ornamental, yet have swaths of features that are not infringed if copied.  See Lee v. Dayton Hudson, 838 F.2d 1186, 1188-89 (Fed. Cir. 1988) ("A device that copies the utilitarian or functional features of a patented design is not an infringement unless the ornamental aspects are

---

[19] Of course, the burden of proof is quite different in the invalidity context because the party raising the affirmative defense of invalidity must do so by "clear and convincing evidence."  Rosco, 304 F.3d at 1377.

also copied.") .  As was the case in OddzOn Prods., the functional
characteristics, while "not invalidat[ing] the design
patent, . . . merely limit the scope of protected subject
matter."  122 F.3d at 1406.  Accordingly, even elements that are
not solely dictated by function are not included in the
comparison to the extent they are functional.

**The '246 Design Patent**

Spotless argues that the proper claim construction for the
'246 design patent broadly encompasses five ornamental features:
(1) the upswept (gull-wing shaped) arms; (2) the hook portion
with a flat top; (3) a top sizer on top of the flat-top portion
of the hook; (4) a pair of ornamentally shaped clips; and (5) a
semi-circular protrusion projecting upwards from the flat-top
portion of the hook when the top sizer is not present.  Spotless
takes the position that these features are "all . . .
ornamental."  Tr. 1143.

A&E, on the other hand, argues that these features are
functional and that the only ornamental features, if any, are the
added flourishes such as the horizontal grooves on the top sizer.
To support its position, A&E points to several utility patents
and testimony averring to the functionality of the hanger
elements.  The function of the features will now be reviewed to
determine the ornamental aspects of the patent.

The upswept arms feature, which was described by Spotless's
expert witness as the dominant element of the design patents is
the focus of the Reissue Patent 36,873 (the "'873 Reissue
Patent"). See Tr. 631. The abstract of the '873 Reissue Patent
describes the hanger as

> A system for displaying garments incorporating
> a light weight, one-piece, molded, plastic
> garment hanger having a hook member, body
> member, and <u>upswept arms</u>, wherein a garment
> retaining clip is longitudinally positioned on
> either side of the hook member at a height
> such that an axis drawn therebetween would
> intersect a circle defined around a center of
> curvature drawn by a radius defined at the
> upper portion of the curve of the hook member,
> <u>to provide a high rack to display ratio</u> for
> garments suspended therefrom.

Exh. 538 ('873 Reissue Patent, Abstract). Indeed, there can be
no dispute that the primary purpose of the upswept arms is to
raise the level of the clips to allow for greater vertical
density. Moreover, the precise height of the clips relative to
the rest of the hanger is also necessary to avoid a tilting
problem. See Exh. 526, at 65. As such, the upswept arms are
functional - indeed, primarily functional - and not ornamental.[20]

---

[20] Even accepting Spotless's argument that the test for
distinguishing ornamental from functional features should be the
same as that for invaliding a design patent, the result would be
identical. The finding that the dominant feature of the design
patent (the upswept arms) is dictated by function leaves few, if
any, realistic alternative designs, concomitantly narrowing the
ornamental sphere of the design patent.

-44-

However, the fact that the upswept arms are themselves functional does not conclusively end the inquiry. The placement of the upswept arms at the particular point of the arm section as well as the upward angle of the arms could still be considered ornamental, and will, therefore, be narrowly[21] considered in the "ordinary observer" comparison.

The second feature, the hook portion with the flat top – also referred to as a flange – is also functional as a means to keep the top sizer firmly in place. Indeed, the purpose of the flat top of the hook is described as a flange in the '422 utility patent:

> the fit and cooperation of the flat edge 17c
> of the cap and the horizontal flange 21 make
> it difficult to insert a screwdriver, or other
> means, with which to pry the side walls apart
> for removal of the cap.

---

[21] Although more relevant in an invalidity analysis based on functionality, Spotless argues that a variety of alternative designs are available that would achieve the same function, and submitted drawings of several proposed designs. See Exh. 1473. Several designs are not viable alternatives because the upswept arms curve upwards, which means that the inner arms cannot accept a promotion hanger card. See Tr. 94. The only seemingly viable alternative (the bottom drawing in Exhibit 1473) has upswept arms further out towards the far end of the hanger. However, it is not clear how that drawing would actually fare in practice. As was described at trial regarding, e.g., the failed 2401 hanger, the road from designing a hanger to actually manufacturing a working hanger is quite bumpy. Here, the design must not only have the upswept arms, but also have a certain equilibrium when weighed down by the garment as well as flexibility. The proposed alternative in the form of a hand drawing, in which the angle on the right upswept arm differs visibly from the angle on the left upswept arm, will simply not overcome the clear utility of the current design. See Exh. 1473.

-45-

Exh. 510 at col. 6, lines 9-13.   The flange feature is also a limitation in claim 8 of U.S. Patent No. 5,857,276.   See Exh. 541 at col. 8, 25-50.

The third feature, a top sizer on top of the flat-top portion of the hook, represents a mix of function and ornamental design.   Of course, the purpose of the top sizer is to indicate information, a functional purpose.   However, the question is whether the rectangular shape of the sizer is dictated by the function.   A&E argues that the rectangular top sizer is depicted and claimed in the '422 and '354 utility patents.   However, other designs are available within those contours as, for example, the top sizers with rounded ends that A&E initially marketed.   Additionally, as A&E concedes, the horizontal grooves are clearly ornamental and are part of the design claim.   Accordingly, the rectangular top sizer is properly construed as part of the '246 design patent.

The clips, however, are almost entirely a creature of function.   The primary purpose of having both the vertical and horizontal clips is to allow for the same hangers to be used for both panties or bras individually, or together as a coordinated set.   See Tr. 103.   Moreover, the U-shaped configuration of the clips is designed to prevent breakage.   See Exh. 2035 (U.S. Patent No. 4,629,102).   However, there are still some ornamental elements in the clip section: most notable, the rounded upper

-46-

outside corner of the clips and the upper horizontal clip being longer than the lower horizontal clip.

Finally, the semi-circular protrusion projecting upwards from the flat-top portion of the hook is partially ornamental. The protrusion has an obvious function being that the boss that engages the top sizer is projected from the protrusion. However, the primary purpose of the semi-circular shape is to allow it to visually blend in better with regular hangers when the top sizer is removed. Accordingly, the semi-circular protrusion is ornamental.

Having construed the '246 design patent, it becomes necessary for the fact-finder, in this case the court, to determine whether the patentee has proven by a preponderance of the evidence that the A&E hanger infringes upon the design patent, beginning with the "ordinary observer" test. In the context of a device "contain[ing] both functional and ornamental features, . . . the patentee must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental." OddzOn Prods., 122 F.3d at 1405 (internal quotation omitted). The ordinary observer in this case is not the general public, but the

sophisticated buyer for the garment manufacturer, who purchases
the hangers.[22]

At the outset, Spotless argues that the interchangeability
of the A&E top sizer and hanger with the Spotless top sizer and
hanger is evidence of proof of confusion among the hanger buyers.
Spotless established at trial that mixed hangers, e.g., the
Spotless hanger with the A&E top sizer, have appeared in some
stores – though none in Target where Spotless has an exclusive
arrangement.   However, as explained by Spotless's own witness,
the interchangeability was by design, meaning the garment
manufacturers deliberately purchased A&E top sizers, knowing that
they were A&E's, but did so simply because A&E's top sizers were
cheaper.   Indeed, the fact that the mixed hangers were only in
stores having non-exclusive arrangements, as opposed to Target,
indicates that the mixed products are not the result of
confusion, but of economic choices regarding price and
automation.   See Tr. 257, 265.

Spotless also introduced survey evidence that purportedly
shows that purchasers of the hangers erroneously identified the

---

[22] The fact that Wal-Mart insisted that the A&E hanger have
the same "overall appearance" as the WP-25 is not of great import
because, as Spotless concedes, it is not the general public that
purchases the hangers.   See Spotless Post-Trial Br. at 34.   Wal-
Mart's concern with the consumer's perception of the "overall
appearance" is merely that consumers do not observe a noticeable
variation among the hangers that would interfere with the
aesthetic display of apparel.

-48-

A&E hanger as being the same as the design depicted in the '246 design patent. In the survey, six buyers for garment manufacturers were shown a drawing from the '246 design patent and were then shown a collection of hangers including an A&E hanger with a size cap and asked, "Do you think any of these hangers are the same as the hanger in the drawing?" However, the survey is severely flawed and does not assist in the infringement determination because all the hangers shown in the survey, other than the A&E hanger, did not have upswept arms. As such, the only hanger remotely related to the dominant feature of the patent (the upswept arms), was the A&E hanger. (For example, the survey did not include a non-A&E design with upswept arms that would not infringe upon the '246 design patent such as any of the alternative designs proposed by Spotless in Exhibit 1473.) Moreover, as explained above, the confusion must be related to the ornamental aspects of the design. Accordingly, the survey is not probative of confusion. See OddzOn Prods., 122 F.3d at 1404 (holding that "survey fail[ed] to establish link between the similarity reported by respondents [in survey] and the patented ornamental aspects of the design" because the survey failed to establish whether the similarities were based on the functional elements of the design).

In comparing the ornamental features of the A&E hanger and the '246 design patent, the following variations draw attention:

-49-

The top sizer has noticeably different etching on the front and
back of the top sizer, the A&E top sizer having vertical grooves,
while the hanger depicted in the '246 design patent has
rectangular horizontal grooves.  The top of the horizontal inner
arms of the A&E hanger is curved while the '246 design patent
depicts parallel top and bottom inner arms.  Also, the base of
the hook in the A&E hanger curves in a different manner, and the
end of the hook is slightly different, with the A&E hanger having
a more pointy finish.  The location and angle of the upswept arms
in the A&E hanger differ as well, with the arms of the hanger in
the '246 design patent at 45 degrees while the angle of the arms
of the A&E hanger at a more drastic 65 degrees.

Finally, the clips of the hook are substantially different.
The vertical clips of the A&E hanger are not serrated, while the
'246 design patent is only partially so; the horizontal clip of
the A&E hanger is serrated, while the '246 design patent is not.
All three clips in the '246 design patent double over in a U-
shaped configuration, while the clips on A&E hanger do not.
Additionally, the upper right hand corner of the clips on the A&E
hanger does not curve, while the '246 design patent does curve.
Finally, the outer sides of the clips on the A&E hanger curve
inward.

As such, the A&E hanger is found not to be substantially
similar to the '246 design patent, and the A&E hanger is found

not to infringe.  Accordingly, a discussion of the "point of
novelty" test is unnecessary.

**The '717 Design Patent**

The '717 design patent claims a design similar to the '246
design patent except that the '717 design patent does not claim
the top sizer and the clips.  Accordingly, the construction of
the claim is identical to that of the '246 design patent, except
to the extent that it deals with the clips or the top sizer.

In terms of the "ordinary observer" test – the sophisticated
"ordinary observer" being the purchaser for the garment
manufacturers – the result is identical as well.  Applying the
considerations stated above regarding the '246 design patent,
there is no substantial similarities in between the ornamental
elements of the '717 design patent and the A&E hanger.  The A&E
hanger is therefore found not to infringe the '717 design patent.

**(2)**

**Invalidity of the Design Patents**

As an alternative argument, A&E argues that the design
patents are invalid because they are functional.  However, given
the holding of non-infringement, the issue of validity need not
be reached.  In any case, however, A&E has not presented the
clear and convincing evidence necessary to invalidate the design

-51-

patents as they were construed.  As the design patents were
constructed, they are primarily ornamental and, therefore, valid.
A hanger, no different than a shoe, can be the proper focus of a
design patent so long as the design patent claims primarily
ornamental features.  <u>See</u> <u>L.A. Gear, Inc. v. Thom McAn Shoe Co.</u>,
988 F.2d 1117, 1123 (Fed. Cir. 1993).

### Trademark Infringement

Spotless has asserted two claims of trademark infringement alleging that A&E infringed  the '405 registration and the '767 registration.   A&E counterclaimed for invalidity of these two registered trademarks and denied infringement in any case.

"The Lanham Act gives a seller or producer the exclusive right to 'register' a trademark, 15 U.S.C. § 1052 (1988 ed. and Supp. V), and to prevent his or her competitors from using that trademark."   Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 162, 115 S. Ct. 1300, 1302 (1995) (citing 15 U.S.C. § 1114(1)). "The purpose of the Lanham Act is to "protect[] consumer and manufacturers from deceptive representations of affiliation and origin."   Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 119 (2d Cir. 2001) (internal quotation omitted).

"To prevail on an infringement claim, a plaintiff must establish that it possesses a valid, legally protectible mark and that defendant's subsequent use of a similar mark is likely to create confusion as to the origin of the product at issue."   Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir.1999) (citing Pirone v. MacMillan, Inc., 894 F.2d 579, 581-82 (2d Cir. 1990)).

"A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the

registrant has the exclusive right to use the mark in commerce. .
. . As a result, when a plaintiff sues for infringement of its
registered mark, the defendant bears the burden to rebut the
presumption of mark's protectibility by a preponderance of the
evidence."  Id. (citing 15 U.S.C. § 1115(a)).  Additionally,
"[w]hen a mark has been registered less than five years, 'any
ground that would have prevented registration in the first place
qualifies as a ground for cancellation.'"  Chere Amie, Inc. v.
Windstar Apparel, Corp., 2002 WL 31108187, at *3 (S.D.N.Y. Sept.
23, 2002) (quoting Cunningham v. Laser Golf Corp., 222 F.3d 943,
946 (Fed. Cir. 2000), and citing 15 U.S.C. § 1064(1)).


**The '767 Registration**

The '767 registration (also referred to as the "low profile
trademark") issued in April, 2001.  See PTX 1325.  The mark is
described as "the configuration of a uniquely styled garment
hanger which incorporates an indicator for displaying information
concerning the goods on the hangers."  Id.  The registration
shows a drawing of the WP-25 hanger and covers the entire hanger
except that the "numeral '32' shown in [the] dotted
representation is not part of the mark but is merely intended to
illustrate a type of information the indicator can convey."  Id.;
see Figure I.  Spotless alleges that A&E has used the low profile

trademark on its hangers.  A&E argues that the '767 registration is invalid because the low profile trademark is functional.



Figure I (PTX 1325).

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex, 514 U.S. at 165, 115 S. Ct. at 1304; see Nora Beverages, 269 F.3d at 120 n.4.  The functionality doctrine also delineates the important distinctions between patent and trademark law:

> It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. § § 154, 173, after which competitors are free to use the innovation.  If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

Qualitex, 514 U.S. at 164-65, 115 S. Ct. at 1304 (citations omitted).

"'[T]he burden . . . falls on the defendant to prove functionality.'"  GTFM, Inc. v. Solid Clothing, Inc., 215 F.

-55-

Supp. 2d 273, 302 (S.D.N.Y. 2002) (quoting <u>Knitwaves, Inc. v.</u>
<u>Lollytogs Ltd.</u>, 71 F.3d 996, 1006 (2d Cir. 1995) (citation
omitted)) (alteration by <u>GTFM</u>).

The functionality of the low profile and other features of
the hangers involved has already been discussed in the
determination of the scope and validity of the design patents.
However, although the general considerations of functionality are
of course similar, the functionality doctrine in trademark law is
quite distinct from the functionality determination in design
patents. Although functionality will invalidate a design patent
only when the design is "<u>dictated</u>" by the function, <u>Rosco</u>, 304
F.3d at 1378, a lesser showing of functionality is necessary to
invalidate trademarks. Functionality will invalidate a trademark
"if it is essential to the use or purpose of the article or if it
affects the cost or quality of the article." <u>Qualitex</u>, 514 U.S.
at 165, 115 S. Ct. at 1304 (internal quotations and citations
omitted) ("[A] product feature is functional . . . if exclusive
use of the feature would put competitors at a significant
non-reputation-related disadvantage."); <u>see</u> <u>also</u> <u>Telebrands</u>
<u>Direct Response Corp. v. Ovation Communications, Inc.</u>, 802 F.
Supp. 1169, 1177 (D.N.J. 1992) (remarking that "the more rigorous
standard of functionality required to defeat a design patent as
opposed to a trade dress claim is reflected in the ownership term

of the respective rights[]" in that the trade dress rights can be perpetual and design patents expire after a limited term).

This is particularly true "in light of the Supreme Court's recent rulings which curtail trade dress protection by expanding the functionality doctrine." Nora Beverages, 269 F.3d at 120 n.4 (citing Qualitex, 514 U.S. at 165, 115 S. Ct. at 1304, and TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 27, 121 S. Ct. 1259-60 (2001)).

In TrafFix Devices, the Supreme Court determined that the spring design on a wind-resistant road sign was functional because the dual-spring design provided a unique and useful way to resist the wind.  The Supreme Court rejected the argument that functionality requires a showing of competitive necessity for the useful design.  The Supreme Court also rejected the argument that the springs were non-functional because a competitor could use three or four springs which would serve the same purpose:

> There is no need, furthermore, to engage . . .
> in speculation about other design
> possibilities, such as using three or four
> springs which might serve the same purpose.
> Here, the functionality of the spring design
> means that competitors need not explore
> whether other spring juxtapositions might be
> used.   The dual-spring design is not an
> arbitrary flourish in the configuration of
> MDI's product;  it is the reason the device
> works.   Other designs need not be attempted.

TrafFix Devices, 532 U.S. at 33-34, 121 S. Ct. at 1262 (citation omitted).  Moreover, the Supreme Court held that "[a] utility

-57-

patent is strong evidence that the features therein claimed are functional." TrafFix Devices, 532 U.S. at 29, 121 S. Ct. at 1260.

As already discussed previously regarding the design patents, the upswept arms, the clips, the flat-top portion of the hook and the top sizer are the subject of utility patents and have distinctly functional features and are, therefore, not properly the subject of a valid trademark. Accordingly, the '767 registration is invalid as a trademark and is not infringed given that it is functional.

### The '405 Registration

The '405 registration (also referred to as the "top sizer trademark") issued on August 22, 2000. See PTX 1326. The mark is described as "the configuration of a uniquely styled indicator which is affixed to a garment hanger." Id.; see Figure J. "The dotted outline of the hanger hook is not part of the mark but is merely intended to show the position of the mark. The numeral '32' shown in dotted representation is not part of the mark but

-58-

is merely intended to illustrate a type of information the
indicator can convey." Id. Spotless alleges that the A&E hanger
infringes the top sizer trademark.



Figure J (PTX 1326).

Spotless argues that the '405 registration establishes that
it possesses a valid, legally protectible mark. The '405
registration was correctly issued by the PTO without a required
showing of secondary meaning because, as the Supreme Court
explained in finding that the device at issue was functional,
"[i]n a case where a manufacturer seeks to protect arbitrary,
incidental, or ornamental aspects of features of a product found
in the patent claims, such as arbitrary curves in the legs or an
ornamental pattern painted on the springs, a different result
might obtain." TrafFix Devices, 532 U.S. at 33-34, 121 S. Ct.
1262. Here, the rectangular horizontal grooves on the top sizer
are an arbitrary flourish that are inherently distinctive and
properly the subject of a valid trademark.

"If a mark is valid, its possessor, in order to succeed on
its infringement claim, must prove that 'numerous ordinary

prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'" <u>Time, Inc. v. Petersen Pub. Co.</u>, 173 F.3d 113, 117 (2d Cir. 1999) (quoting <u>Gruner + Jahr</u>, 991 F.2d at 1077).  The parties agree that the A&E 6005 top sizer has entered the marketplace.  However, the parties disagree as to whether A&E's top sizer is likely to create confusion as to the origin of the product.  To determine the likelihood of confusion, the Second Circuit applies the eight-factor test set forth in <u>Polaroid Corp. v. Polarad Electronics Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961):

> (i) the strength of plaintiff's mark; (ii) the similarity of the parties' marks; (iii) the proximity of the parties' products in the marketplace; (iv) the likelihood that the plaintiff will bridge the gap between the products; (v) actual confusion; (vi) the defendant's intent in adopting its mark; (vii) the quality of the defendant's product; and (viii) the sophistication of the relevant consumer group.

<u>Nabisco, Inc. v. Warner-Lambert Co.</u>, 220 F.3d 43 (2d Cir. 2000) (citations omitted).  However, "the evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins.  Rather, a court should focus on the ultimate question of whether consumers are likely to be confused[.]" <u>Id.</u> (internal quotations omitted); See <u>Nora Beverages</u>, 269 F.3d at 119 (citations omitted).

"The strength, or distinctiveness, of a mark is its power to identify the source of a product." Time, 173 F.3d at 117 (citing Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 743 (2d Cir. 1998)). As mentioned, the rectangular horizontal grooves are arbitrary and fanciful resulting in a strong mark. See id. ("In somewhat circular fashion, consideration of this factor includes an evaluation of the same characteristics that initially determined a mark's validity: inherent distinctiveness, descriptiveness, and secondary meaning."). The trademark has also been in exclusive use by Spotless since 1993 and has remained unchanged since then. Accordingly, this factor favors Spotless.

As to the degree of similarity between the A&E top sizer and the trademark, the A&E top sizer has narrow vertical grooves that are not similar to Spotless's trademark. In arguing for a finding of similarity, Spotless compared the overall top sizer, not just the horizontal grooves. However, as explained above, the complete top sizer is not the proper subject of a trademark given its functionality. Additionally, the issuance of the registration as arbitrary and fanciful, without a requirement of secondary meaning, indicate that the mark at issue encompasses only the horizontal grooves. Accordingly, this factor favors A&E.

As to the bridging the gap, the parties agree that there is no bridge to gap given that the hangers compete directly with each other on the same field.   The parties also do not dispute that the products overlap in the marketplace.

As to A&E's good faith, Spotless argues that the fact that A&E intention was to "slavishly cop[y]" the top sizer in order for the hangers to possess the same overall appearance is evidence of bad faith.   However, "[w]hile intentional copying can raise a presumption of consumer confusion, . . . '[t]he intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product.'"   Nora Beverages, 269 F.3d at 124 (quoting Streetwise Maps, 159 F.3d at 745) (other citations omitted); see also TrafFix, 532 U.S. at 29, 121 S. Ct. at 1260 ("Allowing competitors to copy will have salutary effects in many instances.   'Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology.'") (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 160, 109 S. Ct. 971 (1989)).

"The Polaroid good faith factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product."   Id. (internal quotations omitted).   Here, although A&E clearly intended to imitate the

-62-

Spotless hangers, there is no evidence at all that A&E attempted to mislead anyone as to the source of the hangers. Indeed, when purchasing these hangers, the buyers for the garment manufacturers as well as the mass merchandisers deal directly with A&E and Spotless and purchase the hangers from their respective catalogs. Accordingly, there is no evidence of the any lack of good faith by A&E.

As to actual confusion, there is no evidence[23] of actual confusion although, as pointed out by Spotless, actual confusion is not necessary in the ultimate determination of likelihood of confusion. However, "'[l]ikelihood of confusion means a probability of confusion; it is not sufficient if confusion is merely possible.'" Streetwise Maps, 159 F.3d at 743 (quoting Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997) (internal quotations omitted)). Here, as explained above regarding confusion in the design patent analysis, after 12-18 months of both products in the marketplace, Spotless offered no evidence that the threat of confusion had materialized. Although mixed hangers, e.g., the Spotless hanger with the A&E top sizer, have appeared in some stores – none appeared in Target where Spotless has an exclusive arrangement, and the source of the

---

[23] Once again, the survey evidence is not credited with much weight given their broad comparisons without any attention to whether the trademarks – and not the general features – were the reasons for the similarities or recognition.

-63-

the product is important.  Indeed, given the manner in which these hangers are purchased by the sophisticated purchasers of garment manufacturers, this lack of confusion is not surprising.

Finally, the level of sophistication among the buyers of the hangers is high.  The hangers are purchased by garment manufacturers or their sub-contractors by a designated purchaser. Moreover, to the extent that the garment manufacturer merely buys from the seller approved by Wal-Mart, the level of sophistication is even higher given that the sophisticated department heads at Wal-Mart are the ones who make the decisions as to which hangers to approve.

Weighing these factors, the court finds that Spotless has failed to show that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question.  Accordingly, while as construed, the '405 registration is valid, the A&E top sizer does not infringe the '405 registration.[24]

---

[24] In a prior opinion, see Spotless Enterprises, Inc. v. Carlisle Plastics, Inc., 144 F. Supp. 2d 167 (E.D.N.Y. 2001), it was determined on summary judgment that yet another patent, the '873 Reissue Patent, was valid as construed and, accordingly, not infringed.  Spotless requested that the court rule on the validity of the '873 Reissue Patent in anticipation that this court's narrower construction will be held to be erroneous. Although the court initially indicated that it wanted to resolve all issues and A&E presented no evidence on this issue, the court declines to make the requested ruling given that, in a already lengthy litigation, it is an unnecessary imposition to rule on an issue that is, at least for the present, moot.

## Conclusion

For the foregoing reasons, the Court concludes:

(1) U.S. Patent No. 5,884,422 is valid as construed, but not infringed by the A&E hanger;

(2) U.S. Patent No. Des. 371,246 is valid as construed, but not infringed by A&E hanger;

(3) U.S. Patent No. Des. 377,717 is valid as construed, but not infringed by A&E hanger;

(4) U.S. Trademark Registration No. 2,439,767 is invalid and not infringed;

(5) U.S. Trademark Registration No. 2,378,405 is valid, but not infringed; and

(6) Pursuant to Section 1119 of Title 15, United States Code, the Commissioner of the U.S. Patent and Trademark Office is directed to cancel U.S. Registration No. U.S. Trademark Registration No. 2,439,767.

The Clerk of the Court is directed to close this case.

Dated:    Brooklyn, New York
          December  /  , 2003

                                        SO ORDERED:

                                        ⊂

                                        David G. Trager
                                        United States District Judge

-65-

SENT TO:

Hon. Robert Morris Levy
United States Magistrate Judge


Frank S. DiGiglio
Scully, Scott, Murphy & Presser
400 Garden City Plaza
Garden City, NY 11530-0299


Nancy Meredith Dodderidge
Amster, Rothstein & Ebenstein
90 Park Avenue, 21st Floor
New York, NY 10016